Theodore **LITTLEFIELD**,
Petitioner, Appellant,

v.

Mark C. **CATON**, etc., et al.,
Respondents, Appellees.

No. 88–1260.

United States Court of Appeals,
First Circuit.

Heard July 26, 1988.
Decided Sept. 1, 1988.

Michael L. Parker with whom Murray, Plumb & Murray, Portland, Me., was on brief, for petitioner, appellant.

Peter J. Brann, Asst. Atty. Gen., with whom James E. Tierney, Atty. Gen., and Thomas D. Warren, Deputy Atty. Gen., Augusta, Me., were on brief, for respondents, appellees.

Before BOWNES, NOONAN,* and SELYA, Circuit Judges.

SELYA, Circuit Judge.

This appeal involves a four-dimensional interface between (1) the legislative branch of Maine's government, which over time enacted the series of statutes reproduced in the appendix; (2) the judicial branch, particularly the Maine Supreme Judicial Court (SJC), which declared certain of those statutes unconstitutional as applied; (3) the executive branch, in the persons of Maine's governor, attorney general and the ranking administrators of the state's penal system (including respondent Mark C. Caton, appellee herein); and (4) petitioner-appellant Theodore Littlefield, an inmate confined at Maine's state prison. We begin by summarizing the circumstances.[1]

I.

In January 1976, following his guilty plea to a charged crime of violence, Little-field was sentenced to a lengthy prison term. Under existing law, he was then eligible to receive both basic good-time (BGT) credits at the rate of 7 days per month and extra-meritorious good-time (EMGT) credits, not to exceed 2 days/month. Under prevailing state practice, Littlefield's BGT credits were allotted to him when he began serving his sentence (subject to forfeiture, of course, for disciplinary infractions or other misconduct). Effective May 1, 1976, the state legislature increased BGT, awardable in advance, to 10 days/month. In 1983, it raised allowable EMGT credits to 3 days/month. Persons previously sentenced, including petitioner, were accorded the benefit of these laws. Littlefield's good time was refigured retrospectively, and consequently, his expected parole eligibility and discharge dates were accelerated.

In 1985, the SJC rearranged the legal landscape. In *Bossie v. State*, 488 A.2d 477 (Me.1985), the court held that the 1983 amendments contravened the state constitution. Insofar as the statute applied to previously-sentenced prisoners (like Littlefield), it reduced existing sentences and thus impermissibly "interfere[d] with the executive's explicit and exclusive grant of the commutation power [under] Me. Const. art. III, § 2." *Id.* at 480. Relying principally on *Bossie*, state correctional officials determined that the 1976 amendments (which, like those enacted in 1983, purported retroactively to increase up-front good time) were similarly deficient,[2] and revoked the "extra" BGT and EMGT credits which petitioner had garnered under the 1976 and 1983 laws. This turn of events left Littlefield with exactly the good time afforded by the statutes in force when he was sentenced and first immured—no more, no less.

* Of the Ninth Circuit, sitting by designation.

1. The reader with a thirst for greater detail is referred to the decision below, *Littlefield v. Caton,* 679 F.Supp. 90 (D.Me.1988), and to the appendix, which contains the precise statutory terms and a general chronology showing the legislative ebb and flow. The pivotal SJC decisions are reported. *See Chestnut v. State,* 524 A.2d 1216 (Me.1987); *Bossie v. State,* 488 A.2d 477 (Me.1985).

2. This prognostication proved entirely accurate. The SJC decided the point in *Chestnut,* 524 A.2d at 1219–20.

Petitioner contended that the original bestowal of good time to one in his circumstances, although done in pursuance of enactments subsequently declared invalid, could not lawfully be reversed. After exhausting state remedies, he applied for federal habeas review. 28 U.S.C. §§ 2241–54 (1982). The district court found his rights under the federal Constitution to be unsullied. *Littlefield v. Caton*, 679 F.Supp. at 92–95. We agree.

## II.

This case falls within the zone of influence of our earlier decision in *Lerner v. Gill*, 751 F.2d 450 (1st Cir.), *cert. denied*, 472 U.S. 1010, 105 S.Ct. 2709, 86 L.Ed.2d 724 (1985). Lerner, a Rhode Island state prisoner, was advised in August 1976 that he would be parole-eligible in August 1979, after serving 10 years of his sentence. *Id.* at 452–53. As the date approached, he was transferred to a minimum security facility and various other status adjustments were effectuated. *Id.* at 453. It turned out, however, that the predicted parole eligibility date, established in reliance on the state attorney general's interpretation of the governing statute, was wildly inaccurate. After the attorney general's erroneous interpretation had been disavowed by his successor and rejected by the state supreme court, Lerner was retransferred to maximum security and a new parole eligibility date, some 10 years in the future, was set. *Id.* We refused to order habeas relief, observing:

> It is a fact of life, unlikely soon to be altered, that new laws are often not challenged and finally interpreted until a number of years go by.... The question of when [Lerner] would be eligible for parole was a novel question, and the various officials and courts cannot be blamed for not being of one mind on the matter.... We would be most reluctant to hold that the due process clause of the Constitution took away from the State of

Rhode Island the power to consider and apply its laws correctly in this situation. *Id.* at 459. *Accord Glenn v. Johnson*, 761 F.2d 192, 194–95 (4th Cir.1985) (citing *Lerner*). *Cf. Mileham v. Simmons*, 588 F.2d 1279, 1280 (9th Cir.1979) (*Ex post facto* clause does not give inmate "a vested right in ... an erroneous interpretation" of statute affecting parole eligibility).

▮ So here. When the amendments to the Maine statutes were put to the acid test, they were determined, as a matter of state law, to be unavailable to previously-sentenced felons. Though discomfiting, this adjudication left Littlefield, like Lerner, in precisely the same position as when he was convicted. The fact that both the legislature and the state's penal officials tried to give him greater rewards for good time did not "t[ake] away from the State ... the power to consider and apply its laws correctly in this situation." *Lerner*, 751 F.2d at 459.

*Lerner* controls—and we see no reason to shrink from it. To be sure, Littlefield argues that his case is dissimilar in several material respects—but the claimed distinctions do not seem to make any meaningful difference. It is unnecessary to paint the lily overmuch, for the district court addressed petitioner's major premises in a thoughtful and convincing fashion. *See Littlefield v. Caton*, 679 F.Supp. at 92–95. We affirm, therefore, substantially on the basis of the opinion below. We do, however, add a few words concerning Littlefield's ostensible BGT entitlement.[3]

### A.

Quoting *Brown v. Lundgren*, 528 F.2d 1050, 1052–53 (5th Cir.), *cert. denied*, 429 U.S. 917, 97 S.Ct. 308, 50 L.Ed.2d 283 (1976), petitioner urges that, "[a]t the constitutional level, there is a clear distinction between the loss of a statutory privilege once obtained and the denial of that same privilege, never given." This asseveration,

---

**3.** It would, in our judgment, be supererogatory for us to discuss petitioner's claims concerning the alleged deprivation of EMGT credits earned under the 1983 amendments. To the extent that Littlefield raises a cognizable federal question

on that claim—a matter as to which we express no view—the district court's analysis and answer seems eminently correct. *See Littlefield v. Caton*, 679 F.Supp. at 94–95.

however, must be taken in its appropriate context. The distinction—with which we agree—was set out by the Fifth Circuit not as a means of determining the merits of a constitutional controversy, but merely as a step in ascertaining the existence *vel non* of a constitutionally-protected "liberty or property interest." *Id.* at 1053. The *Brown* court held that denial of a privilege did not engage the Due Process Clause, although revocation of the same privilege, once bestowed, would likely have done so. *Id.*

In the instant case, the distinction is of no consequence. The district court held that petitioner had a constitutionally-protected liberty interest in the good time which had been awarded to him. *Littlefield v. Caton*, 679 F.Supp. at 92. The fact that the district court *also* held—correctly, we think—that no due process violation was perpetrated, *id.* at 91–94, does not vitiate the conclusion that petitioner received the full benefit of the *Brown* dichotomy.

### B.

Petitioner strives mightily to persuade us, based on *Lemon v. Kurtzman*, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973), that the constitutional criteria for retroactive application of judicial decisions were trammeled in this case. The argument, however, is doubly flawed.

In the first place, the *Lemon* Court grappled with the question of when a court should accord retroactive effect to its own holding. *E.g.*, *id.* 411 U.S. at 197, 93 S.Ct. at 1467 (opinion of Burger, C.J.). Here, the situation is appreciably different: the choice is not ours to make, for the Maine SJC has already made it. *See Chestnut*, 524 A.2d at 1220–21 (approving retroactive revocation of like good-time credits). It is settled beyond peradventure that:

A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward.

*Great Northern R. Co. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 364, 53 S.Ct. 145, 148, 77 L.Ed. 360 (1932) (Cardozo, J.).

To the extent (if at all) that federal constitutional interests pertain to the state's choice, the SJC's decision in favor of retroactivity has a sufficiently rational basis to pass muster. Without serious question, backtracking—though it resulted in the revocation of appellant's excess good time—furthered Maine's stalwart interest in confining the commutation power to the executive branch as mandated by the state constitution. *See Chestnut*, 524 A.2d at 1219–20; *see also* Me. Const., art. III, §§ 1–2 ("The powers of this government shall be divided into three distinct departments, the legislative, executive and judicial.... No person or persons, belonging to one of these departments, shall exercise any of the powers properly belonging to either of the others...."). Separation-of-powers concerns are clearly of enough import to underbrace the retroactive judicial mandate at issue here; "[w]ithout a secure structure of separated powers, our Bill of Rights would be worthless, as are the bills of rights of many nations of the world that have adopted, or even improved upon, the mere words of ours." *Morrison v. Olson*, — U.S. ——, 108 S.Ct. 2597, 2622, 101 L.Ed.2d 569 (1988) (Scalia, J., dissenting).

In the second place, even under the *Lemon* formulation, this scenario offers no reason for withholding retroactive effect. *Lemon* instructs courts to reconcile "the constitutional interests reflected in a new rule of law with reliance interests founded upon the old...." *Lemon*, 411 U.S. at 198, 93 S.Ct. at 1468 (opinion of Burger, C.J.). In this case, the reconciled balance tips markedly in favor of retroactivity. The decisions in *Bossie* and *Chestnut* were readily foreseeable; they comported with, rather than overruled, past Maine precedent. *See, e.g., Baston v. Robbins*, 153 Me. 128, 135 A.2d 279, 281 (1957) (legislature is "without authority to control in any way, regulate or interfere" with exclusive executive power of commutation); *cf. Ex parte Davis*, 41 Me. 38, 53 (1856) (discussing separation of powers under state constitution). Because the "new" rule concerned the reduction of previously-imposed sentences, its operative principle could be vindicated *only*

by affording it retrospective effect. And petitioner's reliance interests do not weigh heavily enough to disturb the state's paramount interests in maintaining the integrity of the executive branch of state government and in applying the correct rule of law.

Because reliance, as we see things, is an essential ingredient in the mix, we comment upon it, albeit briefly. Littlefield's reliance claim has both a psychological and a temporal dimension. His counsel places the point in its most alluring perspective:

> [Appellant] received his entire allocation of good time and accelerated discharge date nine years before the 1976 Code provision was determined by the Department of Corrections to be unconstitutional, and eleven years before the [SJC] held that provision unconstitutional in *Chestnut*. That good time benefit bestowed by the State is a hard fact on which Petitioner has relied in making his decisions and shaping his conduct with respect to his release date from prison. His release date, as determined by the good time given to him, has assumed a real and psychologically critical importance to him. For nine years he coped with his confinement in the prison regime, knowing that his discharge would be achieved on a date certain because of the good-time credits he was given in 1976.... As that discharge date dr[ew] near, it assume[d] a greater and greater importance in Petitioner's life....

Appellant's Brief at 11.

All of this is likely true, and rueful. Nevertheless, the composite falls short. While we do not minimize the strain which accompanies a prisoner's dashed expectations in circumstances like these, particularly when the string is played out over a long period of years, we have made clear that misdirection of this sort must "involve[ ] prejudice and harm beyond frustrated expectations" to be constitutionally

redressable. *Lerner*, 751 F.2d at 459. The mere passage of time—even, as here, the passage of many years—does not per se import the existence of such prejudice and harm.[4] Something more—something specific, some concrete injury—must be shown. And petitioner, whose counsel conceded at oral argument that no other, more tangible detriment was present, cannot surmount this barrier.

*Lerner*, we think, remains regnant. There, the prisoner's case on reliance was considerably more compelling. In addition to undergoing the same sort of psychic roller-coaster ride as Littlefield experienced (albeit for a shorter interval), Lerner was transferred to a less restrictive prison environment, was granted work-release and furlough privileges, moved his family to Rhode Island, and was the intended beneficiary of a parental investment (designed to ensure him work in Rhode Island while on parole). 751 F.2d at 453. When the attorney general's interpretation of the law was proven erroneous, Lerner was retransferred to sterner environs, lost his newfound privileges, and his family was left in the lurch. We determined that even such demonstrable manifestations of prejudice were inadequate to prove detrimental reliance in the necessary constitutional sense. *Id.* at 459. No similar changes of position accompanied Littlefield's receipt of BGT under the statutes later declared invalid. *A fortiori*, if Lerner's claim could not succeed, then petitioner's claim must fail.

### III.

We need go no further. From whatever vantage point this case is viewed, it is but a pale pastiche of *Lerner v. Gill, supra*. There was nothing so oppressive about the state's conduct as to demand that the Great Writ issue. Although petitioner's situation is regrettable—it is unfortunate that his hopes were buoyed only to be deflated later

**4.** Petitioner's heavy reliance on dicta appearing in *Breest v. Helgemoe*, 579 F.2d 95, 101 (1st Cir.), *cert. denied*, 439 U.S. 933, 99 S.Ct. 927, 58 L.Ed. 2d 329 (1978), is unavailing. Taken in a vacuum, the intimations of the *Breest* dicta may be suggestive. But when *Breest* is read in tandem with our later decision in *Lerner*, it becomes clear that petitioner's appeal can derive little sustenance from the combination. *See Lerner*, 751 F.2d at 458–59 (inter alia, discussing *Breest*).

—he, like Lerner, is no "worse off than he would have been had the error not been made." *Id.* at 459. His rights under the federal Constitution have not been abridged.[5]

*The judgment of the district court is affirmed.*

## APPENDIX

### I. BASIC GOOD TIME

Me.Rev.Stat.Ann. tit. 34, § 705 (as amended by Me.Laws 1965, ch. 210, effective September 3, 1965) (repealed by Me.Laws 1975, ch. 499, § 58, effective May 1, 1976):

Each convict, whose record of conduct shows that he has faithfully observed all the rules and requirements of the State Prison, shall be entitled to a deduction of 7 days a month from the minimum term of his sentence, commencing on the first day of his arrival at the State Prison. An additional 2 days a month may be deducted from the sentence of those convicts who are assigned duties outside the prison walls or security system, or those convicts within the prison walls who are assigned to work deemed by the Warden of the State. Prison to be of sufficient importance and responsibility to warrant such deduction. Any portion of the time deducted from the sentence of any convict for good behavior may be withdrawn by the Warden of the State Prison for the infraction of any rule of the State Prison, for any misconduct or for the violation of any law of the State. Such withdrawal of good time may be made at the discretion of the warden, who may restore any portion thereof if the convict's later conduct and outstanding effort warrant such restoration. This section shall apply to the sentences of all convicts now or hereafter confined within the State Prison, and shall not be construed to prevent the allowance of good time from maximum sentences or definite sentences.

Me.Rev.Stat.Ann. tit. 17–A, § 1253(3) (enacted by Me.Laws 1975, ch. 499, § 1, effective May 1, 1976) (amended by Me.Laws 1977, ch. 510, § 80, effective October 24, 1977):

Each person sentenced to imprisonment for more than 6 months whose record of conduct shows that he has observed all the rules and requirements of the institution in which he has been imprisoned shall be entitled to a deduction of 10 days a month from his sentence, commencing, in the case of all convicted persons, on the first day of his delivery into the custody of the department.

Me.Rev.Stat.Ann. tit. 17–A, § 1253(3) (as amended by Me.Laws 1977, ch. 510, § 80, effective October 24, 1977) (repealed and replaced by Me.Laws 1983, ch. 456, § 3, effective September 23, 1983):

Each person sentenced, before January 1, 1978, to imprisonment for more than 6 months whose record of conduct shows that he has observed all the rules and requirements of the institution in which he has been imprisoned shall be entitled to a deduction of 10 days a month from his sentence, commencing, in the case of all such convicted persons, on the first day of his delivery into the custody of the department.

Me.Rev.Stat.Ann. tit. 17–A, § 1253(3–A) (enacted by Me.Laws 1977, ch. 510, § 81, effective October 24, 1977) (repealed by Me.Laws 1983, ch. 456, § 4, effective September 23, 1983):

Each person sentenced, on or after January 1, 1978, to imprisonment for more than 6 months shall earn a reduction of 10 days from his sentence for each month during which he has faithfully observed all the rules and requirements of the institution in which he has been imprisoned. Each month the supervising officer of each institution shall cause to be posted a list of all such persons who have earned reductions from their sen-

---

**5.** We see no need to comment specifically upon petitioner's assertion that he was denied equal protection of the laws. We agree with the disposition of this issue by the SJC, *see Chestnut* 524 A.2d at 1220–21, and the district court, *see*

*Littlefield v. Caton,* 679 F.Supp. at 94. *See also Frazier v. Manson,* 703 F.2d 30, 36 (2d Cir.), *cert. denied,* 464 U.S. 934, 104 S.Ct. 339, 78 L.Ed.2d 308 (1983), and cases cited therein.

tences during the previous month. If any such person does not earn all of his reduction from his sentence in any month, a notation of such action shall be entered on a cumulative record of such actions in the person's permanent file.

Me.Rev.Stat.Ann. tit. 17–A, § 1253(3) (as amended by Me.Laws 1983, ch. 456, § 3, effective September 23, 1983) (amended by Me.Laws 1985, ch. 456, § 1, effective September 19, 1985):

Beginning October 1, 1983, each person sentenced to imprisonment for more than 6 months shall be entitled to receive a deduction of 10 days per month calculated from the first day of his delivery into the custody of the department, to include the full length of the unsuspended portion of his sentence, for observing all the rules of the department and institution, except this provision shall not apply to the suspended portion of a person's sentence pursuant to split sentences under section 1203. All persons committed to the custody of the Department of Corrections prior to the effective date of this subsection shall have these provisions applied prospectively to the portion of their sentences remaining to be served.

Me.Rev.Stat.Ann. tit. 17–A, § 1253(3) (as amended by Me.Laws 1985, ch. 456, § 1, effective September 19, 1985) (amended by Me.Laws 1985, ch. 821, § 12, effective August 26, 1986):

Beginning October 1, 1983, each person sentenced, to imprisonment for more than 6 months shall be entitled to receive a deduction of 10 days per month calculated from the first day of his delivery into the custody of the department, to include the full length of the unsuspended portion of his sentence, for observing all rules of the department and institution, except this provision shall not apply to the suspended portion of a person's sentence pursuant to split sentences under section 1203.

Me.Rev.Stat.Ann. tit. 17–A, § 1253(3) (as amended by Me.Laws 1985, ch. 821, § 12, effective August 26, 1986):

Beginning October 1, 1983, each person sentenced to imprisonment for more than 6 months shall be entitled to receive a deduction of 10 days per month calculated from the first day of his delivery into the custody of the department, to include the full length of the unsuspended portion of his sentence, for observing all the rules of the department and institution, except that this provision shall not apply to the suspended portion of a person's sentence pursuant to split sentences under section 1203 nor shall it apply to the suspended portion or to the 12–month period of intensive supervision of a sentence under section 1262.

## II. EXTRA MERITORIOUS GOOD TIME

Me.Rev.Stat.Ann. tit. 34, § 705 (as amended by Me.Laws 1965, ch. 210) (repealed by Me.Laws 1975, ch. 499, § 58, effective May 1, 1976):

Each convict, whose record of conduct shows that he has faithfully observed all the rules and requirements of the State Prison, shall be entitled to a deduction of 7 days a month from the minimum term of his sentence, commencing on the first day of his arrival at the State Prison. An additional 2 days a month may be deducted from the sentence of those convicts who are assigned duties outside the prison walls or security system, or those convicts within the prison walls who are assigned to work deemed by the Warden of the State Prison to be of sufficient importance and responsibility to warrant such deduction. Any portion of the time deducted from the sentence of any convict for good behavior may be withdrawn by the Warden of the State Prison for the infraction of any rule of the state Prison, for any misconduct or for the violation of any law of the State. Such withdrawal of good time may be made at the discretion of the warden, who may restore any portion thereof if the convict's later conduct and outstanding effort warrant such restoration. This section shall apply to the sentences of all convicts now or hereafter confined within the State Prison, and shall not be construed to prevent the allowance of good time from maximum sentences or definite sentences.

Me.Rev.Stat.Ann. tit. 17–A, § 1253(4) (enacted by Me.Laws 1975, ch. 499, § 1, effec-

tive May 1, 1976) (repealed and replaced by Me.Laws 1983, ch. 456, § 6, effective September 23, 1983):

An additional 2 days a month may be deducted in the case of those who are assigned duties outside the institution or who are assigned to work within the institution which is deemed to be of sufficient importance and responsibility to warrant such deduction.

Me.Rev.Stat.Ann. tit. 17–A, § 1253(4) (as amended by Me.Laws 1983, ch. 456, § 6, effective September 23, 1983):

Up to an additional 3 days per month may be deducted in the case of those inmates committed to the Maine State Prison, the Maine Correctional Center or assigned elsewhere by the Department of Corrections, who are assigned work and responsibilities within the institution or program which are deemed to be of sufficient importance to warrant those deductions by the institution head in accordance with policy and guidelines established by the Department of Corrections.

## III. GOOD TIME TRANSITION PROVISIONS

Me.Rev.Stat.Ann. tit. 17–A, § 1254(3) (enacted by Me.Laws 1975, ch. 499, § 1, effective May 1, 1976) (repealed and replaced by Me.Laws 1975, ch. 740, § 120, effective May 1, 1976):

All persons in the custody of the Bureau of Corrections serving a criminal sentence on the effective date of this code shall be released and discharged according to the law as it was in force on the date they were sentenced and such law shall continue in force for this purpose as if this code were not enacted; provided, however, that any such person may elect to be released and discharged according to section 1253 and of this section. Upon such election he shall be released and discharged as if section 1253 and this section were in force on the date he was sentenced.

Me.Rev.Stat.Ann. tit. 17–A, § 1254(3) (as amended by Me.Laws 1975, ch. 740, § 120, effective May 1, 1976) (amended by Me.Laws 1985, ch. 456, § 3, effective September 19, 1985):

All persons in the custody of the Bureau of Corrections pursuant to a sentence imposed under the law in effect prior to the effective date of this code shall be released and discharged according to the law as it was in force prior to the effective date of this code and such law shall continue in force for this purpose as if this code were not enacted; provided that any such person who is entitled to a deduction of 7 days a month from his sentence under the provisions of Title 34, section 705, may elect to have 10 days a month deducted instead of 7. Any such election shall apply to the entire sentence, including that portion of the sentence served prior to the effective date of this code.

Me.Rev.Stat.Ann. tit. 17–A, § 1254(3) (as amended by Me.Laws 1985, ch. 456, § 3, effective September 19, 1985):

All persons in the custody of the Department of Corrections pursuant to a sentence imposed under the law in effect prior to the effective date of this code shall be released and discharged according to the law as it was in force prior to the effective date of this code and such law shall continue in force for this purpose as if this code were not enacted.