Fred DeWITT, Petitioner, Appellee,

v.

Donald VENTETOULO, Acting Director, Adult Correctional Institution, et al., Respondents, Appellees.

Attorney General of Rhode Island, Appellant.

No. 93–1002.

United States Court of Appeals, First Circuit.

Heard June 11, 1993.

Decided Oct. 6, 1993.

Annie Goldberg, Asst. Atty. Gen., Appellate Div. with whom Jeffrey B. Pine, Atty. Gen., was on brief for appellant.

David A. Schechter with whom Margaret–Mary Hovarth was on brief, for appellee.

Before SELYA, CYR and BOUDIN, Circuit Judges.

BOUDIN, Circuit Judge.

The district court granted a writ of habeas corpus, which it stayed pending this appeal, ordering the release from state imprisonment of Fred E. DeWitt, 803 F.Supp. 580. The basis for the writ was the district court's decision that Rhode Island had acted unconstitutionally in increasing DeWitt's sentence and reimprisoning him after his release on parole. We agree with the district court's decision and affirm.

I.

The constitutional issue in this case arises under the Due Process Clause of the Fourteenth Amendment. In some areas, such as search and seizure, due process has been reduced to detailed and nearly mechanical rules. In other areas, the precepts are very general, and everything turns upon the circumstances. The issue here is of this latter type, and so we begin with a complete account of the procedural history of this case.

On March 17, 1978, after a trial by jury, DeWitt was convicted in Rhode Island Superior Court of robbery, assault with intent to murder, and arson. These menacing labels do not convey the full measure of DeWitt's evil conduct. According to testimony given by the victim, a woman then about 67, DeWitt broke into her home while carrying a knife, struck her with his hand and with a hammer, engaged in one brutal act after another, and then bound and gagged the victim and set fire to her apartment.

The superior court imposed on DeWitt a life sentence which meant under Rhode Island law that parole was possible but not for a minimum of 10 years. DeWitt began serving his sentence in 1978 and in 1980 his conviction was affirmed by the Rhode Island Supreme Court. *State v. DeWitt*, 423 A.2d 828 (R.I.1980). Then, in the following year, DeWitt came to the aid of a prison guard who was being assaulted by an inmate, and DeWitt later testified for the state in the prosecution of the inmate. There is some suggestion that DeWitt, not surprisingly, may have suffered at the hands of other inmates on account of his rescue efforts.

In recognition of these efforts, the superior court on June 25, 1981, held a hearing and entered an order suspending all but 15 years of DeWitt's life sentence and providing that he would be placed on probation for 20 years from the time of his future release, whenever that occurred.[1] This shortened the minimum period before DeWitt could seek parole, but six years remained before DeWitt's parole application was granted. In the meantime, in mid–1983, the Rhode Island Supreme Court decided *State v. O'Rourke*, 463 A.2d 1328 (R.I.1983), holding that the superior court could not "suspend" a sentence once a defendant had begun to serve it.[2]

Between 1983 and 1987, the state apparently made no effort to have the superior court undo its partial suspension of DeWitt's life sentence. Instead DeWitt continued to serve his sentence, pursued education and training courses in prison, and applied several times for parole. Finally, in January 1987, DeWitt was granted parole and released from prison. We are told by the state that this occurred about 16 months before the earliest date on which DeWitt would have been eligible for parole if held under a life sentence. Thus, despite *O'Rourke* the prison and parole authorities continued to treat DeWitt as if the order suspending his sentence in part was still in force.

During the eight months following his release in January 1987, DeWitt obtained work, beginning a painting business and then a siding business. He resumed his relationship with family members and his girlfriend. He also rented an apartment but moved out after a disagreement, DeWitt believing that the landlord was billing the entire building's utilities to DeWitt's meter. It was this latter occurrence that began the chain of events leading to this appeal. According to DeWitt, he later returned to his old neighborhood to visit a friend, was invited in by his former landlord, and was then attacked by the allegedly drunken landlord and his wife with knives. In the turmoil, the landlord and his wife were injured.

The landlord's version clearly differed, for the state began criminal proceedings against DeWitt based on the incident. The state also took steps to re-imprison DeWitt based on his 1978 conviction, but it did not use the customary method of seeking to revoke his parole for violation of the good behavior conditions. Instead, after a hearing on September 21, 1987, the superior court vacated its earlier June 1981 order that had suspended in part DeWitt's original life sentence; the court's ruling was that *O'Rourke* showed that the original suspension order had been improper. DeWitt is currently being held in prison pursuant to that reimposed life sentence.

1. This revised sentence was imposed under Rule 35 of the Rhode Island Rules of Criminal Procedure which permitted the court to correct illegal sentences at any time and to reduce sentences within 120 days of either conviction or receipt of mandate affirming the conviction.

2. The court ruled that a state statute, R.I.Gen. Laws § 12–19–10, forbad such suspensions and had not been modified in this regard by Rule 35. *O'Rourke*, 463 A.2d at 1331. It appears that the superior court judge in DeWitt's case was not alone in assuming, prior to *O'Rourke*, that a suspension power did exist under Rule 35.

The rest of the procedural story can be briefly told. At some point after September 1987 DeWitt was tried on state charges growing out of the knife incident with his landlord, and DeWitt was acquitted by the jury. In January 1988, DeWitt made a new motion under Rule 35 to alter his life sentence. The superior court denied the motion as untimely. An appeal followed, challenging both the reimposition of the life sentence and the denial of the new Rule 35 motion. The Rhode Island Supreme Court rejected the first challenge, including DeWitt's express claim that the reimposed sentence violated the Due Process Clause. *State v. DeWitt*, 557 A.2d 845 (R.I.1989). The court ruled that the Rule 35 claim was timely, but, on remand, the superior court denied the Rule 35 motion on the merits and no appeal was taken.

On December 11, 1990, DeWitt filed his habeas petition in the district court. The district court conducted an evidentiary hearing, adducing many of the facts set forth above. On October 20, 1992, the district court issued a memorandum and order granting the habeas petition. The district court's judgment, which it stayed pending this appeal, was entered on December 10, 1992.

Judge Boyle's decision granting DeWitt's habeas petition relied directly upon the Due Process Clause as construed by this court in *Breest v. Helgemoe*, 579 F.2d 95 (1st Cir.), cert. denied, 439 U.S. 933, 99 S.Ct. 327, 58 L.Ed.2d 329 (1978). There, this court stated that "the power of a sentencing court to correct [upward] even a statutorily invalid sentence must be subject to some temporal limit" and that in some circumstances such a correction "might be fundamentally unfair, and thus violative of due process...." *Id.* at 101. After a careful analysis of the present facts, Judge Boyle concluded that fundamental unfairness did exist here, especially given the state's failure to take any steps to reimpose the life sentence in the four years after *O'Rourke* and prior to DeWitt's release. The state then brought this appeal.

## II.

█ There is no surer recipe for confusion than to answer two different questions at the same time. Thus, in assessing DeWitt's due process claim, we put to one side for the moment the fact that DeWitt may have violated the good behavior conditions attached to his parole. Instead, we ask whether—assuming *arguendo* that no parole violation occurred—the superior court was nevertheless entitled six years after the event to correct its earlier mistaken grant of Rule 35 relief and to reimpose the original life sentence.

█ The Constitution contains no general rule that prohibits a court from increasing an earlier sentence where the court finds that it was erroneous and that a higher sentence was required by law. On the contrary, this has occurred, and been upheld against constitutional or other challenges, in a number of cases including *Breest* itself.[3] And in principle, there is no difference between such cases and a case like this one in which a sentence is reduced and later, finding the reduction to be unlawful, the court reinstates the original sentence.

But in law what is true for the usual case is often not true in the extreme case. Even the state conceded at oral argument that due process must impose some outer limit on the power to revise sentences upward after the fact. We are concerned here not with the substantive grounds of a state's decision to reduce or increase a sentence, but rather with the inherently procedural issue of whether and when a state can reopen a matter after a final unappealed decision, after a substantial lapse in time during which the

3. *See, e.g., United States v. DiFrancesco*, 449 U.S. 117, 133–34, 101 S.Ct. 426, 435–36, 66 L.Ed.2d 328 (1980); *United States v. Rico*, 902 F.2d 1065, 1068–69 (2d Cir.), cert. denied, 498 U.S. 943, 111 S.Ct. 352, 112 L.Ed.2d 316 (1990); *United States v. Cook*, 890 F.2d 672, 675 (4th Cir.1989); *Littlefield v. Caton*, 856 F.2d 344, 348–49 (1st Cir. 1988); *United States v. Ortega*, 859 F.2d 327, 334 (5th Cir.1988), cert. denied, 489 U.S. 1027, 109 S.Ct. 1157, 103 L.Ed.2d 216 (1989); *United States v. Villano*, 816 F.2d 1448, 1451 (10th Cir.1987); *Lerner v. Gill*, 751 F.2d 450, 458 (1st Cir.), cert. denied, 472 U.S. 1010, 105 S.Ct. 2709, 86 L.Ed.2d 724 (1985); *United States v. Lundien*, 769 F.2d 981, 986–87 (4th Cir.1985), cert. denied, 474 U.S. 1064, 106 S.Ct. 815, 88 L.Ed.2d 789 (1986); *Burns v. United States*, 552 F.2d 828, 831 (8th Cir.1977).

state had actual knowledge of the error, and after a significant change in circumstances. In short, the question we face is one of *process*.

In *Breest*, we said that notions of fundamental fairness do place some temporal limit on later increases in sentence, 579 F.2d at 101, and the Fourth Circuit, in *Lundien*, has endorsed this view. 769 F.2d at 987; *see also Villano*, 816 F.2d at 1458 (Logan, J. concurring). It is quite true that the cases following *Breest* generally found, as did *Breest* itself, that the particular upward revision in question did not violate due process. A convicted defendant does not automatically acquire a vested interest in a mistakenly low sentence. Only in the extreme case can a court properly say that the later upward revision of a sentence, made to correct an earlier mistake, is so unfair that it must be deemed inconsistent with fundamental notions of fairness embodied in the Due Process Clause. *Accord Lundien*, 769 F.2d at 987.

In our view, there is no single touchstone for making this judgment, nor any multi-part formula. Rather, drawing on considerations mentioned by cases like *Breest* and suggested by common sense, we think that attention must be given—our list is not exclusive—to the lapse of time between the mistake and the attempted increase in sentence, to whether or not the defendant contributed to the mistake and the reasonableness of his intervening expectations, to the prejudice worked by a later change, and to the diligence exercised by the state in seeking the change. To be sure, doctrine should evolve *toward* yardsticks and formulas, making law more predictable and reducing the need for *ad hoc* decisions by judges. But that is the end point of the journey, and we are at the beginning.

We start with the central and singular fact that the state, which was represented at the hearing in which DeWitt's sentence was suspended in 1983 and the state did not seek

judicial correction of this decision even though reconsideration or review by a higher court are the ordinary and expected ways in which errors are corrected.[4] The state had a second chance also to correct the error in 1983 after the Rhode Island Supreme Court held in *O'Rourke* that the suspension power could not be used after a prisoner had begun to serve his sentence; once again, the state made no effort (so far as the record reveals) to apply to the trial court to undo the suspension of DeWitt's sentence error. The process that DeWitt received, therefore, begins with a remarkable double default by the state. It is not a matter of the state being estopped: rather, in deciding what is fundamentally unfair we cannot ignore the fact that with due diligence the state could have challenged the suspension long before DeWitt's release.

Following the state's double default, circumstances changed substantially. In contrast to cases like *Breest*, DeWitt not only continued for a number of years in prison reasonably believing that his sentence had been reduced, but he was actually released. He remained free from January 1987 to September 1987 and laid down new roots in society, acquiring a job and reestablishing family ties. Only at this point, did the superior court correct its original mistake and reimprison him. The lengthy delay and change of circumstances are not decisive but they contribute to the judgment whether due process was afforded by the belated reopening.

Finally, due process requires a weighing not only of the defendant's interest in finality, but of the state's interest in correcting error. Yet there is no sign that Rhode Island has undertaken any wide-scale program to identify and resentence those whose earlier sentences were suspended in violation of *O'Rourke*. Rather, DeWitt appears to have been singled out primarily to relieve the state of the trouble of conducting a parole revocation hearing. The impression is hard to avoid that the resentencing here primarily serves only to skirt the minimal due process obligations that attach to parole revocations, that the state could conduct such a proceed-

---

4. The state has advised us that it has no right of "appeal" from an order suspending a sentence under Rule 35. However, apart from the opportunity to seek reconsideration, even brief research indicates that mandamus is normally available where an officer acts beyond his or her authority. 6 R.I. Gen. Laws § 8–1–2; *Brant v. McSoley*, 106 R.I. 385, 260 A.2d 443 (1970); *McKinnon v. Housing Authority*, 114 R.I. 686, 338 A.2d 517 (1975).

ing at minimal cost, and that the state's own self-proclaimed interest in vindicating *O'Rourke* is limited to this case.

As we have said, there are numerous cases allowing a sentence to be increased after it was initially imposed in error. In virtually all that we have discovered, there has been some distinguishing circumstance that separates that case from DeWitt's, for example, because (as is often true) the defendant was still in prison, or the interval between the original sentence and its correction was brief, or because the defendant almost certainly knew or should have known that an error had been made.[5] Conversely, we are completely satisfied, as *Breest* and *Lundien* said in dicta, that due process must in principle impose an outer limit on the ability to correct a sentence after the event.

Thus we face here the familiar due process problem of deciding how much is too much. In concluding that DeWitt's case crosses the line, we have taken into account a range of considerations: the multi-year period between the suspension and the reimposition of sentence, the reasonableness of DeWitt's reliance, his release from prison and formation of new roots, the unusual tardiness of the state in failing to correct the error from 1983 onward, and the existence of an alternative parole revocation remedy. These elements cannot be calibrated precisely, nor can they be taken in isolation. The outcome here is the result of the combined weight of the elements.

We reach our conclusion with diffidence because federal judges have no monopoly on wisdom in deciding what is unfair, and even harsh decisions by state authorities usually raise no constitutional issue. But we are confident that this case is very unusual and that our decision imposes no serious constraint on state authorities who, unlike federal judges, have the direct responsibility for the law-enforcement and prosecutorial tasks at hand. In sum, this case is the very rare exception to the general rule that courts can, after sentence, revise sentences upward to correct errors.

### III.

We turn now to Rhode Island's counter arguments and, in particular, to the issue we earlier reserved concerning DeWitt's supposed parole violation. The state has fought earnestly for its position that the district court erred in granting the writ, but in our view the arguments on which the state lays most stress are not very compelling.

The state argues broadly that the original suspension of DeWitt's life sentence was a matter of discretion, and the decision to parole him before the end of his new 15-year sentence was likewise discretionary. From these premises the state concludes that DeWitt cannot have an interest in remaining at large that is protectable under the Due Process Clause. But it is one thing to say that DeWitt could not have compelled the suspension of sentence or the grant of parole; it is quite another to ignore the reality that the discretion was exercised in his favor and the state is now trying to withdraw what it has bestowed.

■ Rhode Island is not required to give away its property but if it gave away its state house as a gift, it is unlikely it could get it back without paying just compensation to the new owner. More closely on point, the state is not obliged by the Constitution to parole its prisoners, but having done so, it is obliged to afford them due process—what process is due is another matter—when it revokes paroles. *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). The case relied upon by the state for its discretion argument, *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), involved the very different question whether the state is obliged to provide due process in deciding *whether* to grant parole.

The state's main arguments in this case are narrower and center upon DeWitt's fight with his former landlord. DeWitt was warned, the state points out, that his parole could be revoked if he got himself into trouble. That he was acquitted by a jury of

---

**5.** *Compare Lerner,* 751 F.2d at 458 (mistake corrected after three years but while defendant still in prison); *Cook,* 890 F.2d at 674 (mistake corrected after three weeks while defendant awaiting a report date for community confinement); and *Rico,* 902 F.2d at 1068–69 (mistake—of which defendant must have known—discovered three days after defendant erroneously sentenced to time served and released).

causing the trouble, says the state, means nothing; the burden of proof in that trial was beyond a reasonable doubt, while in parole revocation, state law requires only evidence that would "reasonably satisfy" the decision-maker that a violation occurred. *Walker v. Langlois,* 104 R.I. 274, 243 A.2d 733, 737 (1968). Quoting from DeWitt's own testimony about the incident, the state suggests that DeWitt's version of the struggle with the landlord is contradictory and improbable.

These arguments remind one of a boxer leading with his chin. No one doubts that the state could at the outset have conducted a proceeding to revoke DeWitt's parole. DeWitt's story that he was attacked without provocation by the landlord *and* his wife, both armed with knives, is one that any parole board lawyer might enjoy testing on cross-examination. The Constitution has not been read to require proof beyond a reasonable doubt in a parole revocation proceeding. *E.g., Whitehead v. U.S. Parole Commission,* 755 F.2d 1536, 1537 (11th Cir.1985). If the state found that DeWitt had misbehaved, it could have surely cancelled his parole.

But this is not what happened. There has been no official determination of wrongdoing by DeWitt, and he has not been returned to prison to serve a 15–year sentence. The state can hardly expect that this court will determine, based on the state's selection of transcript excerpts, that DeWitt was at fault. It may well be that under Rhode Island law the state can still revoke DeWitt's parole on account of the knifing incident. We have no competence to revoke the parole, and no occasion to consider any federal claims that DeWitt might make against such a remedy.[6] But as matters now stand, DeWitt is being held pursuant to a judgment sentencing him to life imprisonment, a judgment unlawfully reimposed on DeWitt in violation of the Constitution.

In the concluding section of its brief, the state asserts in one sentence that DeWitt's claim in this court is foreclosed by his failure to appeal to the Rhode Island Supreme Court after the superior court on remand denied his new Rule 35 motion. When that motion was denied, DeWitt had already presented to the Rhode Island Supreme Court the due process claim on which we pass today, and that court had already rejected that claim on the merits. DeWitt had thus fully exhausted his state remedies to vindicate his due process claim, and the state's exhaustion objection is meritless.

*Affirmed.*

---

**6.** Possibly DeWitt would argue that due process precluded revoking his parole for misconduct after the jury acquittal. However, like most circuits, we have sustained the use of "acquitted conduct" to increase sentences under the Sentencing Guidelines, based on the same distinction as to burden of proof urged by Rhode Island in this case. *E.g., United States v. Mocciola,* 891 F.2d 13, 16–17 (1st Cir.1989).