# United States Court of Appeals

## For the First Circuit

No. 08-1712

GILBERT ESPINOZA,

Petitioner, Appellant,

v.

CAROLYN A. SABOL, WARDEN OF FMC DEVENS,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin and Lipez, Circuit Judges.

Timothy G. Watkins, Federal Defender Office, for appellant.
Anton P. Giedt, Assistant U.S. Attorney, with whom Michael
J. Sullivan, U.S. Attorney, was on brief for appellee.

February 27, 2009

**LYNCH**, **Chief Judge**.  The primary issue raised on this federal habeas appeal is whether an escaped prisoner can shorten his term of actual incarceration under the common law doctrine of credit for time erroneously at liberty because, after he was picked up, he was inadvertently released and remained at liberty for a period of fourteen months before he was eventually arrested again. The district court answered this question "No," Espinoza v. Sabol, No. 06-cv-11974-NG (D. Mass. Apr. 30, 2008), and so do we.

I.

In 1987, Gilbert Espinoza was sentenced to a term of 84 months' imprisonment for two federal drug convictions.  The U.S. Parole Commission set a presumptive parole date of January 9, 1994 for Espinoza.  He never met that date while in custody and so was not on parole.  Instead, about two weeks before his presumptive parole date, he escaped.  On December 26, 1993, he walked away from the New Mexico halfway house in which he had been serving his sentence.  At that point, more than two years of the 84-month term remained to be served.

The Bureau of Prisons ("BOP") on January 6, 1994 found him guilty of escape and subsequently made a recommendation to the Parole Commission that his presumptive parole date be rescinded, after a disciplinary hearing which Espinoza did not attend.  On January 31, 1994, the Commission reopened and "retarded" his presumptive parole date and scheduled a rescission hearing to take

-2-

place upon Espinoza's return to a federal institution.  See 28 C.F.R. § 2.34(a) (1993).  "Retard" is a term of art in the parole context and means to postpone a presumptive parole date.  See King v. Simpson, 189 F.3d 284, 288 (2d Cir. 1999).  A criminal escape charge under 18 U.S.C. § 751(a) was also filed against Espinoza in federal court.

Espinoza remained at liberty until June 5, 1995, when state authorities in New Mexico arrested him for shoplifting.[1] They transferred him to the custody of the U.S. Marshals Service. Federal prosecutors declined to pursue the criminal escape charge. The U.S. Marshals Service, rather than returning Espinoza to prison to serve the remainder of his sentence for the 1987 drug crimes, mistakenly released him from custody on June 7, 1995.  Although the record is not clear, the Marshals seem to have booked Espinoza incorrectly -- Espinoza, whose full name is Gilbert Espinoza-Saenz, was apparently misidentified as Gilbert Espinoza-Sanchez, a man of approximately the same age with a social security number similar to Espinoza's and who was not subject to a prison sentence at the time.

Fourteen months later, on August 6, 1996, Espinoza was arrested again, this time on new federal drug charges.  In federal court in New Mexico, he pled guilty and was sentenced to a term of

---

[1]    Espinoza concedes that he cannot obtain sentence credit for the period between December 26, 1993 and June 5, 1995.

151 months' imprisonment on March 10, 1997.  The sentencing court was aware of Espinoza's prior sentence -- Espinoza's pre-sentence report noted that he had time remaining on his 1987 sentence and that he had committed his new offense after escaping.  The court was not explicit as to whether Espinoza's new sentence should run concurrently with his 1987 sentence or whether they should run consecutively.

Upon Espinoza's return to custody and after a hearing on August 14, 1997, the BOP found him guilty of escape.  The Parole Commission rescinded Espinoza's presumptive parole date on April 21, 1998 on the basis of this finding, as well as based on his new conviction.  The BOP then calculated Espinoza's period of incarceration, concluding that he had to serve the remainder of his 1987 sentence with credit for periods that he spent in custody, including the period of June 5-7, 1995.  Because the New Mexico federal district court had been silent as to whether Espinoza's new sentence would be served concurrently or consecutively with the 1987 sentence, the BOP decided the question and concluded that the sentences were consecutive.  The result was that Espinoza served the remainder of his 1987 sentence from August 6, 1996 to January 10, 1999 and began serving his 1997 sentence immediately thereafter.

Espinoza filed a pro se petition for habeas relief under 28 U.S.C. § 2241 in Massachusetts federal court, alleging that the

BOP had erred in calculating his period of incarceration and was requiring him to serve time on the dismissed escape charge. The court appointed counsel, who reframed the issues. In a supplemental pleading, Espinoza argued that he was entitled to credit against his sentence for the time he spent at liberty between June 7, 1995 and August 6, 1996 and that the BOP had erred in determining that his two sentences were to run consecutively.

On April 30, 2008, the district court granted the government's motion to dismiss, holding that the June 5-7, 1995 detention did not recommence his sentence and thus did not trigger the time at liberty doctrine and that the BOP had correctly determined that Espinoza's sentences were to run consecutively. The court concluded that the Parole Commission had erred in not holding a rescission hearing within 90 days of Espinoza's return to federal custody, see 28 C.F.R. § 2.34(a), but that this error did not entitle Espinoza to additional sentence credit.

## II.

A.        The Doctrine of Credit for Time Erroneously at Liberty

Espinoza argues he should be given credit against his sentence for the time he spent erroneously at liberty. Espinoza's argument is that because the U.S. Marshals Service erred (by confusing him with a similarly named person with a like social security number) in releasing him on June 7, 1995, he should be given credit through August 6, 1996, the date of his next arrest,

toward his sentence. He says it was not his fault he was released on June 7, 1995, but the government's, and so his final release date should have been October 28, 2008 and not December 26, 2009.

The length of the term of actual imprisonment to be served following a criminal conviction and sentence is subject to various constitutional and other legal restraints, both as to increases and as to decreases of the time in confinement. For example, an increase in sentence after a defendant has begun to serve his sentence may contravene the constitutional prohibition against double jeopardy. Breest v. Helgemoe, 579 F.2d 95, 99 (1st Cir. 1978). However, if the original sentence was erroneous, the Constitution contains no general rule prohibiting a court from finding that sentence erroneous and holding that a sentence of greater length was required by law. DeWitt v. Ventetoulo, 6 F.3d 32, 34 (1st Cir. 1993).

As to a claimed decrease in time of incarceration, substantive due process may prohibit the continued incarceration of a prisoner under certain facts. The substantive component of the Due Process Clause is violated by executive action "when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" County of Sacramento v. Lewis, 523 U.S. 833, 847 & n.8 (1998) (quoting Collins v. City of Harker Heights,

503 U.S. 115, 128 (1992));[2] see also United States v. Acosta-Martinez, 252 F.3d 13, 21 (1st Cir. 2001) ("When testing executive action, the Supreme Court has used the 'shocking to the conscience' test."); DeWitt, 6 F.3d at 35. Most cases in which a prisoner seeks credit for his time at liberty involve some form of constitutional due process claim.[3] While we have not explicitly addressed such a claim, we have recognized that in the "extreme case" -- based on a number of factors -- sentence revision may "cross[] the line" and violate due process; and our rationale could conceivably apply to a time at liberty constitutional claim. See DeWitt, 6 F.3d at 34-36. But this is not an extreme case, and

---

[2]      "[The] criteria to identify what is fatally arbitrary [under the Due Process Clause] differ depending on whether it is legislation or a specific act of a governmental officer that is at issue." Lewis, 523 U.S. at 846. The alternate formulation of the test usually applied to legislative action is whether the conduct violates a fundamental right or liberty implicit in the prisoner's due process rights. Washington v. Glucksberg, 521 U.S. 702, 719-21 (1997). No court has held that a prisoner has a fundamental right to remain free after he has been released erroneously, and some have flatly rejected the claim. See, e.g., Hawkins v. Freeman, 195 F.3d 732, 747 (4th Cir. 1999) (en banc).

[3]      Some circuits have addressed a due process theory that a state waives its jurisdiction when it delays executing a sentence. Bonebrake v. Norris, 417 F.3d 938, 941-44 (8th Cir. 2005) (rejecting claim based on four years' delay by a state in imprisoning petitioner). Others have used the theory that the government is constitutionally estopped from reincarcerating the petitioner. Green v. Christiansen, 732 F.2d 1397, 1399 (9th Cir. 1984). The Ninth Circuit has treated similar arguments in a case involving erroneous release on parole under a non-constitutional equitable estoppel theory. Johnson v. Williford, 682 F.2d 868 (9th Cir. 1982). Other courts have approached similar questions as constitutional ones of implied pardon or commutation. See, e.g., Shields v. Beto, 370 F.2d 1003 (5th Cir. 1967).

appropriately Espinoza does not make any claims to release based on a constitutional provision. We will assume, in Espinoza's favor, that he may seek relief even when no due process claim is stated.

In the federal criminal justice system, mechanisms for granting credits that can be used to adjust time served have been largely set by legislation. For example, 18 U.S.C. § 3585(b) specifies that a defendant convicted of a federal crime has a right to receive credit for certain time spent in official detention before his sentence begins. That credit is determined by the Attorney General, not by a court. See United States v. Wilson, 503 U.S. 329, 334-35 (1992). In the Sentencing Reform Act of 1984, Congress, with few exceptions, abolished parole, which eliminated one mechanism for allowing prisoners credit to reduce their time served. Prisoners may now receive credit only in carefully circumscribed situations, such as for their good behavior while incarcerated.[4] See, e.g., 18 U.S.C. § 3624(b) (allowing grant of credit toward the service of a sentence for satisfactory behavior). The relationship between the release date and credits to be given for satisfactory behavior is set forth in 18 U.S.C. § 3624. See Perez-Olivo v. Chavez, 394 F.3d 45, 47 & n.1 (1st Cir. 2005). Although Congress could have codified some program of credit for

---

[4] Further, Fed. R. Crim. P. 35 permits a judge, on motion of the prosecution, to reduce a sentence for specified reasons, such as post-conviction cooperation and substantial assistance to the prosecution.

persons erroneously released, it has not done so. Espinoza's claim to early release is not based on any statute.

Congress's strong interest in federal sentences raises other considerations, which interact with the claim Espinoza makes. Espinoza's argument raises a concern about the allocation of power over the length of actual imprisonment between the federal judicial branch and the executive branch. See Wilson, 503 U.S. at 335-36. By definition, arguments such as Espinoza's are presented to courts when the executive branch officials, exercising whatever discretion has been allotted to them, have decided not to give the prisoner the credits he seeks.

Second, concerns may be raised about whether the asserted federal common law doctrine alone survives the Sentencing Reform Act of 1984. See G.J. Chin, Getting Out of Jail Free: Sentence Credits for Periods of Mistaken Liberty, 45 Cath. U. L. Rev. 403, 404 (1996). The answer to that question is neither briefed to us nor necessary to our conclusion. Application of the common law doctrine, however, may not be divorced from the overall purposes for sentencing set by Congress in the 1984 Sentencing Reform Act. These purposes include the need for "uniformity, honesty, and proportionality." United States v. O'Neil, 11 F.3d 292, 297 n.4 (1st Cir. 1993); see also S. Rep. No. 98-225, at 50-60, reprinted in 1984 U.S.C.C.A.N. 3182, 3233-43 (listing statutory goals

including comprehensive and consistency, elimination of sentencing disparity, and certainty in release dates).

Espinoza's claim is based entirely on the common law "time at liberty" doctrine.[5] We will assume the federal common law doctrine still has vitality, despite its lack of legislative recognition. The federal doctrine was apparently first articulated in 1930 in White v. Pearlman, 42 F.2d 788 (10th Cir. 1930). Judge Posner, in Dunne v. Keohane, 14 F.3d 335 (7th Cir. 1994), set forth a core purpose of the doctrine:

> The government is not permitted to play cat and mouse with the prisoner, delaying indefinitely the expiation of his debt to society and his reintegration into the free community. Punishment on the installment plan is forbidden.

Id. at 336. In this view, the doctrine is "only a rule of interpretation, . . . an attempt laden with considerations of policy, to divine the will of the legislature." Id. at 337; see also Boston v. Att'y Gen., 210 F. App'x 190, 193 & n.2 (3d Cir. 2006) (per curiam) ("[W]here the danger animating the rule is not present, the common law rule need not be inflexibly applied."). We agree that the doctrine is not a general criminal equity doctrine, to be exercised at the discretion of federal courts.

---

[5]  This court has never published an opinion on the doctrine. Some form of the issue was raised in one case, which was settled by an agreement that the defendant would receive credit against his sentence for more than 13 months. See United States v. Nickens, No. 94-1861, 1995 WL 314483 (1st Cir. April 14, 1995).

The situations the doctrine was designed to encompass have been variously explained.  Some courts, most notably the Fifth and Seventh Circuits, have indicated that it should be applied only where "the government is trying to delay the expiration of the defendant's sentence."  Dunne, 14 F.3d at 337; see Bintzler v. Gonzales, 239 F. App'x 271, 275 (7th Cir. 2007) (finding the doctrine "of dubious application where the government has not intentionally sought to delay . . . imprisonment") (emphasis added); Free v. Miles, 333 F.3d 550, 554 (5th Cir. 2003) (stressing that the doctrine's "sole purpose is to prevent the government from abusing its coercive power to imprison a person by artificially extending the duration of his sentence through releases and reincarcerations").

Other courts have focused instead on the right of the prisoner "to re-establish himself and live down his past" and have therefore applied the doctrine where a prisoner is discharged without fault regardless whether the government's discharge was intentional or negligent.  White, 42 F.2d at 789; see also United States v. Greenhaus, 89 F.2d 634, 635 (2d Cir. 1937) (per curiam).  The most recent court to adopt and expand upon the latter view is the Third Circuit.  Vega v. United States, 493 F.3d 310, 319 (3d Cir. 2007) (adopting a burden-shifting framework whereby, once the prisoner shows he has been released with unserved time remaining on his sentence, "the burden shifts to the government to prove either

-11-

(1) that there was no negligence on the part of the imprisoning sovereign, or (2) that the prisoner obtained or retained his liberty through his own efforts").[6]

Espinoza urges adoption of the Vega burden-shifting framework, claiming he is entitled to a presumption of credit based on his showing that he was released despite having time remaining on his sentence; therefore, the burden shifts to the government to negate negligence or show he was at fault. We need not decide whether negligence might, in certain situations and in combination with other factors, suffice to trigger the doctrine. However, our view is quite different than the Third Circuit's, both as to the allocation of burdens and as to the role given negligence simpliciter.

In our view, the burden of proof under § 2241 is on the prisoner Espinoza, as it is on other prisoners in § 2241 cases. Espinoza's claim is that he has a right to be released upon the grounds that the sentence was imposed in violation of law. The burden of proof of showing deprivation of rights leading to unlawful detention is on the petitioner.[7] Walker v. Johnston, 312

---

[6] Even under the broader view, the doctrine is not a broad discretionary criminal equity doctrine but takes into account society's interest in having prisoners serve their sentences, the need to avoid intentional abuses of government power, and the impact on a prisoner who has genuinely started a new life.

[7] On a federal habeas petition, there is also a presumption of regularity of the sentence, which the petitioner must overcome. Daniels v. United States, 532 U.S. 374, 381 (2001); Johnson v.

U.S. 275, 286 (1941); see also Waddington v. Sarausad, 129 S. Ct. 823, 831 (2009); Smith v. Robbins, 528 U.S. 259, 285-86 (2000); Bader v. Warden, 488 F.3d 483, 488 (1st Cir. 2007).

As to the use of negligence in evaluating the claim, we will assume the government was negligent in releasing Espinoza. Indeed, it strikes us that in virtually every case in which there was a mistaken release of a prisoner there will have been some form of government negligence. The degree of negligence and, indeed, whether there was intentional error by the government may be highly relevant considerations, but do not shift any burdens. There are other legal reasons for this. Courts must be cautious in approaching federal common law. See Atherton v. FDIC, 519 U.S. 213, 225-26 (1997) (requiring significant conflict with or threat to federal interest before allowing creation of federal common law); Mauser v. Raytheon Co. Pension Plan for Salaried Employees, 239 F.3d 51, 57 (1st Cir. 2001) (stressing the need to "exercise caution in creating new common law rules" under ERISA).

In addition, practical concerns support our view. The BOP releases about 41,000 inmates a year; all U.S. correctional systems combined release about 630,000 inmates a year. D. Wall, A Game of Cat and Mouse -- or Government and Prisoner: Granting Relief to an Erroneously Released Prisoner in Vega v. United

---

Zerbst, 304 U.S. 458, 468 (1938); Lema v. United States, 987 F.2d 48, 51 (1st Cir. 1993); cf. United States v. Butt, 731 F.2d 75, 80 (1st Cir. 1984) (motion to vacate sentence).

States, 53 Vill. L. Rev. 385, 386 n.9 (2008).  One court has noted that erroneous releases are frequent, and thus not so uncommon as to raise an issue of executive branch arbitrariness.  Hawkins, 195 F.3d at 742.

Petitioner argues that a broad understanding of the at liberty doctrine is necessary as a deterrent to mistakes being made by the executive.  That deterrence rationale is flawed; we doubt very much that bureaucratic mistakes of the sort made here would be in the least deterred.  The U.S. Marshals service has no incentive to release prisoners contrary to rules.  Cf. Herring v. United States, 129 S. Ct. 695, 700 (2009) (noting that Fourth Amendment exclusionary rule is meant to apply only where necessary to deter future governmental misconduct).

In the end, we need not define the outer reaches of the doctrine.  We hold that Espinoza has not met his burden of showing that the at liberty doctrine applies in this case.  We acknowledge that Espinoza does not seek credit for his entire time at liberty but only for that time following his mistaken release.  Still, the erroneous release happened only because Espinoza had earlier escaped from his halfway house and this caused the need to process him again when he was first apprehended.  Espinoza created the situation.  But for his escape, the issue would not have arisen. There was no intent by the government to string out the time Espinoza had to serve; this is plainly not a case of punishment of

the prisoner on the installment plan. There is not the slightest hint in the record that the mistake was motivated by a desire to single out Espinoza or by any improper motive. Nor was there arbitrariness or capriciousness by any government actor. At most there was a mistake; mistakes are simply part of life.

The at liberty doctrine, even in its broader incarnations among the circuit courts, was never meant to reward prisoners for escaping. At common law, an escaped prisoner could not have received credit for the time he was at large, and there must not have been any contributing fault on his part. See White, 42 F.2d at 789. A doctrine meant to protect against government abuses of prisoners through cat and mouse games of imprisonment cannot be turned into a game of catch me if you can.

The district court's rejection of the doctrine in this case is affirmed.

B.      Other Arguments

Espinoza also claims he is entitled to immediate release because the BOP erred in determining that his 1987 and 1997 sentences were to run consecutively. Thus, his § 2241 petition before the district court also challenged that BOP determination.

The initial question is one of the appropriate standards of review. Our review of the district court's rejection of his habeas claim is de novo. See Teti v. Bender, 507 F.3d 50, 56 (1st Cir. 2007). Most circuits consider that the district court's

review of a BOP decision about credits is for abuse of discretion. See, e.g., Fegans v. United States, 506 F.3d 1101, 1105 (8th Cir. 2007); Bintzler, 239 F. App'x at 275-76; see also United States v. White, 91 F. App'x 162, 163 (1st Cir. 2004) (per curiam) (noting that the discretion to credit time served is vested in the Attorney General, through the BOP). We need not resolve the latter standard.

Whether multiple terms of imprisonment are consecutive or concurrent is governed by 18 U.S.C. § 3584(a), which states:

> If multiple terms of imprisonment are imposed on a defendant at the same time, or if a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively . . . . Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently.

The district court concluded that because the 1987 and 1997 sentences were imposed at different times, Espinoza was subject to the statutory presumption that the sentences were to run consecutively. It held that Espinoza had offered nothing to rebut the presumption.

On appeal, Espinoza argues that, because he had only two weeks remaining on his 1987 sentence at the time of his escape, the BOP could only credit two weeks of the time he spent in custody between his August 6, 1996 arrest and his March 10, 1997 sentencing to that sentence. See 18 U.S.C. § 3585(b)(1). He argues from this

he was not "already subject to an undischarged term of imprisonment" within the meaning of § 3584(a), and thus the statutory presumption that his terms were consecutive did not attach.

Espinoza reaches this conclusion on the basis of his erroneous view that his presumptive parole date of January 9, 1994 remained effective until the Parole Commission officially rescinded it on April 21, 1998. The record is directly contrary. Espinoza escaped from custody before reaching his presumptive parole date and that parole date was retarded. Thus, he was not on parole and remained subject to the undischarged term of his sentence.

When the Parole Commission reopened and retarded his presumptive parole date in January 1994, it also scheduled a rescission hearing upon Espinoza's return to a federal institution. See generally 28 C.F.R. § 2.34(a) (1993).[8] Because Espinoza never

---

[8] Espinoza's argument is incorrect that the Parole Commission violated a regulatory requirement that it hold a rescission hearing within 90 days of his return to federal custody. The 90-day provision applies only to decisions to reopen and retard parole made without a hearing. See 28 C.F.R. § 2.34(a) (1993). Because Espinoza committed new criminal behavior (the escape), he was subject to a separate provision of § 2.34(a) under which a rescission hearing was scheduled for him "on the first docket following [his] return to a federal institution." Id.; see also U.S. Parole Comm'n, Rules & Procedures Manual 115, available at http://www.usdoj.gov/uspc/rules_procedures/uspc-manual111507.pdf. Regardless of the length of the delay, Espinoza cannot show he was prejudiced by it and thus it cannot serve as the basis for habeas relief. Cf. White v. Hubbard, No. 95-1750, 1996 WL 86190, at *1 (1st Cir. Feb. 29, 1996) (per curiam) (discussing delay in parole revocation hearing); see also Tippins v. Luther, 869 F. Supp. 331, 337 (W.D. Pa. 1994). Espinoza was not prejudiced because the delay

-17-

reached his presumptive parole date before he escaped and because the Parole Commission reopened and retarded his parole date before he was able to serve the time remaining on his sentence, he remained subject to his undischarged prison term. He was serving that sentence, which had approximately 22 months remaining factoring in good time credit, when the New Mexico federal district court sentenced him in March 1997. The BOP so concluded.

Espinoza was subject to the presumption in § 3584(a) that his 1997 sentence was to be served consecutively to his 1987 sentence. He has provided nothing to defeat that presumption.

### III.

We <u>affirm</u> the district court's order dismissing Espinoza's habeas corpus petition under 28 U.S.C. § 2241.

---

had no effect on his ability to present a defense or on the length of his resulting sentence.