[Cite as *State v. Eaton*, 2022-Ohio-1340.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 29098 |
| | : | |
| v. | : | Trial Court Case No. 1985-CR-2210/1 |
| | : | |
| JAMES E. EATON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 22nd day of April, 2022.

. . . . . . . . . . .

MATHIAS H. HECK, JR. by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

JON PAUL RION, Atty. Reg. No. 0067020 & CATHERINE H. BREAULT, Atty. Reg. No. 0098433, 130 West Second Street, Suite 2150, P.O. Box 10126, Dayton, Ohio 45402
      Attorneys for Defendant-Appellee

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} The State appeals the judgment of the Montgomery County Court of Common Pleas which granted James E. Eaton's "motion to refrain from ordering return to prison," contrary to our mandate in *State v. Eaton*, 2d Dist. Montgomery No. 27996, 2019-Ohio-2998 ("*Eaton III*"), essentially keeping Eaton out on "shock probation." For the reasons that follow, the trial court's judgment will be reversed, and Eaton must be returned to prison.

## I.      Facts and Procedural History

{¶ 2} The following facts are taken from our 1987 opinion in *State v. Eaton*, 2d Dist. Montgomery No. 9848, 1987 WL 17101 (Sept. 16, 1987) ("*Eaton I*") and *Eaton III*. On November 12, 1985, Corissa Miller was walking down Main Street in Miamisburg when Eaton and co-defendant Donald E. Powell stopped their vehicle and offered her a ride. She got in the car and asked them to drive her to Franklin. Instead of driving her south to Franklin as promised, Eaton and Powell drove to a remote road, parked, and forced Miller to undress, whereupon they each tried unsuccessfully to have intercourse with her. During that encounter, both men digitally penetrated and performed oral sex on Miller.

{¶ 3} Eaton and Powell then drove Miller to Eaton's residence where, over the course of several hours, they took turns having vaginal intercourse with her. At one point Miller was threatened with a knife, and Powell and Eaton also made threatening references to a gun and a baseball bat. After several hours, Miller persuaded Eaton to let her go by promising him she would not tell anyone about what had happened.

{¶ 4} Miller eventually did go to the police, and Eaton was charged with one count of kidnapping, five counts of rape, five counts of gross sexual imposition (GSI), and one

count of attempted rape. The case proceeded to trial, at which the State elicited testimony from another woman that, on the same day Miller was victimized, she was offered a ride by Eaton and Powell, taken to Eaton's apartment, and forced to engage in sexual activities as well.

{¶ 5} At the end of the trial, Eaton was convicted of all counts and sentenced to 5-25 years in prison for kidnapping; 5-25 years for each count of rape; one year for each count of GSI; and 4-15 years for attempted rape. The court ordered all the rape sentences to run concurrently with each other and all the GSI sentences to run concurrently with each other. The court then ordered Powell to serve the sentences for each class of crime consecutively to each other for an aggregate term of 15-65 years in prison. Powell's convictions were affirmed on direct appeal in *Eaton I*, as was his sexual predator designation in *State v. Eaton*, 2d Dist. Montgomery No. 18690, 2001 WL 1388518 (Nov. 9, 2001) ("*Eaton II*").

{¶ 6} On June 18, 2018, Eaton filed a motion for shock probation pursuant to R.C. 2929.201. One month later, the State filed its opposition, arguing that Eaton's rape conviction made him ineligible for shock probation. The next day, the trial court granted Eaton's motion, reasoning that Eaton had completed the prison term for rape and could be released on probation for the remainder of his sentence. In a supplemental decision, the trial court concluded that the eligibility requirements for shock probation in the former R.C. 2951.02 did not apply to offenders who remained incarcerated after July 14, 2014, for crimes committed prior to July 1, 1996. In other words, the trial court found that Eaton was eligible for shock probation even though he had been convicted of rape.

**{¶ 7}** The State appealed, and on July 26, 2019, we reversed and remanded, stating that "[Eaton] was ineligible for shock probation, and the trial court therefore erred by granting his motion for shock probation. * * * The trial court's judgment is reversed, and this matter is remanded for further proceedings." *Eaton III,* 2d Dist. Montgomery No. 27996, 2019-Ohio-2998, at ¶ 18-19.

**{¶ 8}** Less than a week after our decision in *Eaton III* was released, the State filed a "notice of remand," and then on December 9, 2019, after the Ohio Supreme Court declined to exercise jurisdiction over the case, filed a "motion to place case on the docket and for defendant to be returned to prison." Ten days later, on December 19, 2019, Eaton filed a "motion to refrain from reimposition of sentence." The State filed a memorandum in opposition.

**{¶ 9}** Between mid-February 2020 and mid-October 2020, the case stalled due to COVID and a series of continuances filed by the trial court and Eaton. Finally, on October 16, 2020, the court held an evidentiary hearing at which Eaton presented expert testimony from Dr. Frederick L. Peterson, who testified that Eaton was unlikely to reoffend and that placing him back into prison would be detrimental to his physical and emotional well-being. The trial court agreed.

**{¶ 10}** In its March 22, 2021, Decision and Entry granting Eaton's "motion to refrain from ordering return to prison," the trial court made several key findings. First, the court determined that Powell had demonstrated that he had been rehabilitated and had been a productive citizen since his 2018 release, and the court stated it believed that "return[ing] Powell * * * to prison to serve out the remainder of the sentence imposed in April 1986,

would be a denial of the rights to liberty and justice and fundamental fairness." Decision and Entry at 4. The court further held that "[c]ontinued incarceration toward the maximum of 65 years * * * would deny * * * Eaton [his] constitutional rights not to be subjected to cruel and unusual punishment and due process of law, especially in light of this judge returning [him] to society in 2018." *Id.* at 5. Finally, the trial court found "that having served 33 years in prison, serving more time after being released would be cruel and unusual punishment." *Id.* at 7.

**{¶ 11}** The State has appealed and raises a single assignment of error.

**II.     The trial court erred by not returning Eaton to prison**

**{¶ 12}** In its assignment of error, the State argues that the trial court erred by failing to carry-out this court's mandate that Eaton's shock probation be revoked. While that assignment of error is relatively straight forward, several important constitutional issues are implicated in the trial court's Decision and Entry and the parties' briefs to this court; we will address them in a way that facilitates our analysis.

<u>There was a mandate to revoke shock probation</u>

**{¶ 13}** The parties begin by disputing whether the trial court had a mandate from our opinion in *Eaton III* to revoke Eaton's shock probation and return him to prison. There is no question that a mandate existed.

**{¶ 14}** App.R. 27 states that "[a] court of appeals may remand its final decrees, judgments, or orders * * * to the court * * * below for specific or general execution thereof, or to the court below for further proceedings therein." Once given direction from the reviewing court, the trial court may not vary the mandate and is required to execute it.

*State v. Watkins*, 2d Dist. Clark No. 2010-CA-88, 2011-Ohio-2979, ¶ 10. *See also Nolan v. Nolan*, 11 Ohio St.3d 1, 5, 462 N.E.2d 410 (1984) (absent extraordinary circumstances, like an intervening decision from the Supreme Court, an inferior court has no discretion to disregard the mandate of a superior court in a prior appeal in the same case).

**{¶ 15}** In our previous decision, we made it clear and evident that Eaton was ineligible for shock probation and reversed the trial court's judgment to the contrary. *Eaton III*, 2d Dist. Montgomery No. 27996, 2019-Ohio-2998, at ¶ 18. And while we were not explicit in our direction for what was to come next ("The trial court's judgment is reversed, and this matter is remanded for further proceedings." *Id.* at ¶ 19.), it is difficult to imagine any other course of action stemming from our finding that Eaton was ineligible for shock probation than to remand him into the custody of the Ohio Department of Rehabilitation and Corrections ("ODRC").

**{¶ 16}** But even if the trial court did not believe there was an exacting mandate from *Eaton III*, it still lacked the authority to alter Eaton's sentence, which it did by deciding Eaton did not have to go back to prison. "Ohio trial courts do not possess the inherent authority to modify a criminal sentence once that sentence has been executed absent specific statutory authority to do so." *State v. Palmer*, 2d Dist. Montgomery No. 20101, 2004-Ohio-3571, ¶ 7. In this case, Eaton's 15- to 65-year term had not been completely served, nor had he been granted parole by the Adult Parole Authority ("APA"); granting him purportedly permanent release altered the sentence, and the trial court was without the authority to take that action.

**{¶ 17}** The trial court attempted to justify its sentence alteration by critiquing both

the length of Eaton's sentence imposed by its predecessor and the statutory indefinite sentencing scheme used at the time. It is worth noting, as the State points out, that Eaton's individual prison terms were within the statutory range authorized by the legislature at the time, and the validity of his sentence (length or otherwise) has never been disputed. And while the trial court was correct in pointing out that the indefinite sentencing scheme used to sentence Eaton was drastically altered in 1996 when S.B. 2 ushered in *definite* sentences (had he been sentenced under this scheme, he could have faced a definite prison term for a rape conviction of 3, 4, 5, 6, 7, 8, 9, 10, or 11 years), the pendulum has swung back to *indefinite* terms of incarceration under Reagan Tokes (S.B. 201). Regardless of any court's personal view of the wisdom of a specific sentencing system, "arguments for and against particular sentencing schemes are for legislatures to resolve." *Harmelin v. Michigan*, 501 U.S. 957, 1007, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991).

{¶ 18} We conclude that after the trial court's decision to put Eaton on shock probation was reversed in *Eaton III*, it had a mandate to return him to the custody of the ODRC. We further hold that the trial court had no legal basis to modify Eaton's sentence.

Equitable Estoppel

{¶ 19} Eaton also argues that "the doctrine of equitable estoppel precludes the reimposition of [his] sentence." We disagree.

{¶ 20} "Equitable Estoppel is a defensive doctrine preventing one party from taking unfair advantage of another when, through false language or conduct, the person estopped has induced another person to act in a certain way, with the result that the other

person has been injured in some way." *Black's Law Dictionary* (11th ed. 2019). The doctrine is based on the principles of fraud. *Id.* *See State v. Fraley*, 2d Dist. Montgomery No. 13822, 1993 WL 187929, *1 (June 3, 1993) (Under the doctrine of equitable estoppel, one who has by his statements or conduct induced another to take a course of action is bound to adhere to it and cannot declare to the contrary, though he might otherwise have a right to do so.).

{¶ 21} As a general rule, however, the doctrine does not apply against the State. *Columbus v. Pub. Util. Comm.*, 103 Ohio St. 79 (1921). "Exceptions exist with respect to acts undertaken by the state in its proprietary capacity, such as operation of a water department, or in the sale of its own lands." (Citations omitted.) *State v. Johnson*, 2d Dist. Montgomery No. 21074, 2006-Ohio-417, ¶ 13. Equitable estoppel will not be applied against the State in its governmental, sovereign, or public capacity, "unless its application is necessary to prevent fraud or manifest injustice." *Id.*

{¶ 22} In the case at bar, Eaton attempts to argue that he detrimentally relied upon the actions and statements of the trial court, so it should now be estopped from remanding him back into the custody of the ODRC. There are, however, problems with that position. Pertinently, the doctrine of equitable estoppel does not apply to the trial court. We have previously said that "[t]he Montgomery County Court of Common Pleas performs a function imposed upon the state as an obligation of sovereignty, a function which is performed by counties as political subdivisions of the state pursuant to legislative requirement. The court thus performs a governmental function. The doctrine of equitable estoppel is therefore inapplicable to the common pleas court." (Citations omitted.) *Id.* at

¶ 14.

{¶ 23} The doctrine would also be inapplicable to the Montgomery County Prosecutor's Office. *See S.R. Prods. v. Gerrity*, 156 Ohio App.3d 150, 2004-Ohio-472, 805 N.E.2d 104, ¶ 28 (8th Dist.) ("In performing those duties that are imposed upon the state as obligations of sovereignty, such as protection from crime * * * or preserving the peace and health of citizens and protecting their property, it is settled that the function is governmental.").

{¶ 24} But even if the possibility of equitable estoppel could be imputed upon the State (prosecutor), it has never acted in a way to which the doctrine would be applicable, because Eaton was never induced into a detrimental position by the State. From the outset, the State opposed shock probation. The State filed a memorandum in opposition to Eaton's motion for shock probation one month after the original motion was filed. When the motion was granted and Eaton was released from prison, the State instantly filed an appeal to this court. After we reversed and remanded the trial court in *Eaton III*, the State, less than a week later, filed a "notice of remand" with the trial court, and when the trial court took no action, the State filed a "motion to place case on docket and for defendant to be returned to prison." Eaton then filed his "motion to refrain from reimposition of sentence," which the State opposed, and finally, when the trial court granted Eaton's motion to remain free, the State appealed. There would be the same result if Eaton had relied on the trial court's position; he could not have reasonably expected finality as the State was in opposition throughout. Eaton could not have been ignorant to the fact that his release might be in error.

{¶ 25} The doctrine of equitable estoppel does not apply in this case.

Constitutional Issues

{¶ 26} Even though we have concluded that the trial court erred by granting Eaton's "motion to refrain from ordering return to prison" and that the doctrine of equitable estoppel is inapplicable in this case, our inquiry does not end there, as Eaton and the trial court allege constitutional issues.

**A. Due Process**

{¶ 27} Eaton's next argument is that reincarceration would be contrary to the fundamental principles of liberty and justice and would be in violation of his due process rights.

{¶ 28} "Due process" does not have a precise definition, but its source is found in the Fifth Amendment to the United States Constitution which reads: "No person shall be * * * deprived of life, liberty, or property without due process of law[.]" Though originally only applicable to the federal government, the principle was extended to the states by the Fourteenth Amendment. The concept is present in the Ohio Constitution as well. "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law[.]" Article I, Section 16, Ohio Constitution. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

{¶ 29} Over the course of time, two distinct branches of due process have emerged. Procedural due process challenges the "adequacy of the procedures employed

in a government action that deprives a person of life, liberty, or property." *Ferguson v. State*, 151 Ohio St.3d 265, 2017-Ohio-7844, 87 N.E.3d 1250, ¶ 42. The reason for the procedural due process requirement is "to ensure that whenever government action deprives a person of life, liberty or property, such a deprivation is implemented in a fair manner." *State v. Newberry*, 77 Ohio App.3d 818, 821, 603 N.E.2d 1086 (4th Dist.1991).

{¶ 30} "Substantive due process claims are those that allege a violation of a constitutional right which is implicit in the concept of ordered liberty, deprivation of which is inherently offensive to notions of fundamental fairness." *I-Star Communications Corp. v. City of E. Cleveland*, 885 F.Supp. 1035, 1040 (N.D.Ohio 1995). *See also Rochin v. California*, 342 U.S. 165, 169, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (due process is the "constitutional guarantee of respect for those personal immunities which * * * are "so rooted in the traditions and conscience of our people as to be ranked as fundamental" or are "implicit in the concept of ordered liberty' "). Deprivations of substantive due process can be divided into two categories: (1) deprivations of a particular constitutional guarantee; and (2) actions that shock the conscience. *Mansfield Apt. Owners Assn. v. Mansfield*, 988 F.2d 1469, 1474 (6th Cir.1993).

{¶ 31} Eaton's core argument seems to be that returning him to prison would be "fundamentally unfair," but it is unclear if he believes doing so would be problematic under the procedural or substantive due process branches. Therefore, to be as comprehensive as possible, we will analyze Eaton's claims under both prongs.

{¶ 32} Procedural due process "encompasses, at a minimum, notice and an opportunity to be heard." *State v. Crews*, 179 Ohio App.3d 521, 2008-Ohio-6230, 902

N.E.2d 566, ¶ 9 (2d Dist.). The concept is flexible, however, and varies depending on the importance attached to the interest. *State v. Hochhausler*, 76 Ohio St.3d 455, 459, 668 N.E.2d 457 (1996). In other words, the more important the interest is (in Eaton's case - liberty), the more extensive the process needs to be.

{¶ 33} After examining the record, we conclude that Eaton had no shortage of procedural due process. After he filed his motion for shock probation, the State responded, and the trial court granted his motion with a 12-page decision which was then supplemented by an additional eight-page decision and entry. There was also a full and complete appeals process which included an unsuccessful jurisdictional application to the Ohio Supreme Court. Upon completion of the *Eaton III* appeals process, Eaton filed his "motion to refrain from imposition of sentence," which was met with an opposition memorandum by the State, an evidentiary hearing, a lengthy decision by the trial court, and now this appeal and oral argument. There can be no doubt that Eaton received extensive procedural due process befitting his important liberty interest.

{¶ 34} Having found no procedural due process violations, we turn now to substantive due process. The concept of substantive due process is much more imprecise than its procedural counterpart. Substantive due process protects against (1) deprivations of a particular constitutional guarantee; and (2) actions that shock the conscience. *Mansfield Apt. Owners Assn.* 988 F.2d at 1474. Because both the trial court (although its main argument is couched under cruel and unusual punishment terms) and Eaton focus on the second prong, "actions that shock the conscience," so too will our analysis.

{¶ 35} One of the things that makes this body of law so tricky is that there is no bright line rule on what exactly "shocks the conscience." The United States Supreme Court has held conduct that shocks the conscience is so brutal and offensive that it does not comport with traditional ideas of fair play and decency. *Breithaupt v. Abram*, 352 U.S. 432, 435, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957). It has further stated that the type of government methods that rise to the level of a due process violation must "do more than offend some fastidious squeamishness or private sentimentalism about combating crime too energetically." *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 327, 96 L.Ed. 183 (1952). The Sixth Circuit Court of Appeals has asserted that "[c]onduct shocks the conscience if it violates the decencies of civilized conduct." *Range v. Douglas*, 763 F.3d 573, 589 (6th Cir.2014). What shocks the conscience, then, is subjective; but the courts have been clear that the " 'shocks the conscience' standard is not a font of tort law, but is instead a way to conceptualize the sort of egregious behavior that rises to the level of a substantive due process violation." *Granato v. Davis,* 2d Dist. Montgomery No. 26171, 2014-Ohio-5572, ¶ 79.

{¶ 36} In his brief, Eaton remarks in generalities about how reimposing his prison sentence would be shocking to his conscience and fundamentally unfair. Instead, he details the progress he has made as a law-abiding citizen since his release. And while it is commendable that Eaton has reestablished a "normal" life, that does not demonstrate that his substantive due process rights would be violated if he were sent back to prison. It is hard to see how reimposing his actual sentence would "violate the decencies of civilized conduct" or be "so brutal and offensive that it does not comport with traditional

ideas of fair play and decency."

{¶ 37} Nevertheless, Eaton points us to several cases he believes to be analogous. The first case cited is *DeWitt v. Ventetoulo*, 6 F.3d 32 (1st Cir.1993). DeWitt was convicted in 1978 of robbery, assault with intent to murder, and arson and sentenced to life in prison with the possibility of parole after ten years. While in prison in 1981, DeWitt came to the aid of a corrections officer who was being assaulted by another inmate, and in recognition of his heroics, the trial court entered an order suspending all but 15 years of the sentence.

{¶ 38} In 1983, the Rhode Island Supreme Court decided a case which held that a trial court could not suspend a sentence once a defendant had begun to serve it. This decision made DeWitt's new, shorter sentence invalid. However, between 1983 and 1987, the State did nothing to correct DeWitt's now-invalid sentence.

{¶ 39} In 1987, DeWitt was paroled early but reoffended. As an alternative to revoking DeWitt's parole, the trial court vacated its 1981 order that had suspended his original life sentence. After unsuccessfully appealing in Rhode Island state court, DeWitt filed a federal habeas action which turned out to be successful. The federal court stated that "due process must in principle impose an outer limit on the ability to correct a sentence after the event." *Id.* at 36. The First Circuit stated that it found several factors to be important in reaching its conclusion, including the period between suspension and the reimposition of sentence, the reasonableness of DeWitt's reliance, and the state's years-long failure to correct the sentencing error. *Id.*

{¶ 40} While on the surface *DeWitt* seems to be similar the case at bar, it is

distinguishable in significant ways. First, Eaton's sentence was never changed by the trial court. It started as 15-65 years in 1986 and remains so to this day. It was not suspended in the way that DeWitt's was; instead Eaton was impermissibly granted shock probation This case is also different in that the State opposed Eaton's shock probation from the start. That is in stark contrast to *DeWitt,* where the prosecutor never acted to correct the trial court's error. The difference in State action also illustrates a final distinction – reliance. DeWitt's reliance on his freedom considering the complete inaction by the State was much more reasonable than Eaton's in this case. It is unreasonable for Eaton to rely on the finality of his release when he knew the State opposed it since July 2018, even before he was granted shock probation by the trial court. The State has never wavered in its opposition.

{¶ 41} Eaton also cites a string of cases for the proposition that "when a prisoner is released prior to service or expiration of his sentence through no fault or connivance of his own, and the authorities make no attempt over a prolonged period of time to reacquire custody over him, he may be given credit for the time involved, [and] he will not be required at some later time to serve the remainder of his sentence." Appellee's Brief at 7, citing *White v. Pearlman*, 42 F.2d 788 (10th Cir.1930) and others. Again, Eaton's case is much different. The State has steadfastly tried to bring him back into custody since 2018.

{¶ 42} Eaton has not demonstrated that remanding him back into the custody of the ODRC would shock the conscience. The situation is no doubt unfortunate, but being required to serve a lawfully imposed sentence does not rise to the level of a substantive due process violation.

## B. Cruel and Unusual Punishment

{¶ 43} Both the trial court (in its decision and entry) and Eaton (in his brief to this court) based most of their arguments on the Eighth Amendment's proscription of cruel and unusual punishment. The Eighth Amendment to the United States Constitution states, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." What cruel and unusual punishment looks like in practice, however, is unclear. "The recent Supreme Court jurisprudence in this area has mainly focused on capital punishment, mandatory life sentences, and life sentences for juvenile defendants. For non-capital, non-life-sentence punishments, the Eighth Amendment offers very little in the way of a check on the legislature's ability to affix penalties to crimes." *State v. Presley*, 2013-Ohio-3762, 995 N.E.2d 256, ¶ 7 (2d Dist.).

{¶ 44} The Ohio Supreme Court has noted that cruel and unusual punishment applies only to the rare case where the penalty would be " 'considered shocking to any reasonable person.' " *State v. Weitbrecht*, 86 Ohio St.3d 368, 371, 715 N.E.2d 167 (1999), quoting *McDougle v. Maxwell*, 1 Ohio St.2d 68, 70, 203 N.E.2d 334 (1964). "[P]unishments which are prohibited by the Eighth Amendment are limited to torture or other barbarous punishments, degrading punishments unknown at common law, and punishments which are so disproportionate to the offense as to shock the moral sense of the community." *McDougle* at 69.

{¶ 45} Eaton, in his brief, walks a fine line, knowing that challenging the length of his sentence as cruel and unusual is a losing proposition because "[a]s a general rule, a sentence that falls within the terms of a valid statute cannot amount to cruel and unusual

punishment." *Id.* In contrast, he tries to thread the needle, conceding that the original sentence imposed on him was not cruel and unusual, but that "the sentence has become so disproportionate as to 'shock the conscience' given the underlying circumstances before the Court at this time[.]" The changed circumstance, he argues, is that he has lived a law-abiding life since being released from prison in 2018. He also cites the expert opinion of Dr. Frederick Peterson, who testified that Eaton was unlikely to reoffend and that placing him back into prison would be detrimental to his physical and emotional well-being.

{¶ 46} But even taking all that to be true, nothing has changed about Eaton's sentence. If sent back to prison, he would still be serving the same 15- to 65-year sentence he was serving when he was incorrectly released from prison in 2018. The trial court, though, found that Eaton had "already served a prison term grossly disproportionate to [his] offense in one course of conduct in November, 1985. More than 'a pound of flesh' has been extracted from [him]." Decision and Entry at 7. And while it is true that Eaton has served a long time, his sentence itself was not cruel or unusual. *See State v. Hairston*, 118 Ohio St.3d 289, 2008-Ohio-2338, 888 N.E.2d 1073, ¶ 21 (sentences that fall within the terms of a valid statute are not cruel and unusual punishment). Further, "[w]here none of the individual sentences imposed are grossly disproportionate to their respective offenses, an aggregate prison term resulting from consecutive imposition of those sentences does not constitute cruel and unusual punishment." *Id.* at syllabus. We cannot say that Eaton's disposition was grossly disproportionate to his crimes considering the underlying facts of the case: the teenage

victim was held against her will for hours, repeatedly raped, and threatened with knives.

{¶ 47} Eaton also contends that "a sentence lacking any legitimate penological justification is by its nature disproportionate to the offense and cruel and unusual." Appellee's brief at 5. This position seems to ignore the fact that his sentence was imposed based on the facts in the previous paragraph and convictions on five counts of rape, five counts of GSI, kidnapping, and attempted rape. There was a penological justification.

{¶ 48} Eaton then directs our attention to *McKellar v. Arizona State Dept. of Corr.*, 115 Ariz. 591, 566 P.2d 1337 (1977), a case which he claims cuts in his favor. McKellar was mistakenly released from prison after the parole authority miscalculated his release date. Upon release, he obtained a well-paying job, applied for college, and "conducted himself as a model parolee." *Id.* at 592. A few months later, corrections authorities realized their mistake, and McKellar was summarily taken back into custody; he appealed on cruel and unusual punishment grounds.

{¶ 49} The Arizona Supreme Court concluded that while the error which caused McKellar to be reincarcerated was the government's fault, it did not "methodically and purposefully plan to cause appellant further punishment by its mistake." *Id.* at 593. The court went on to conclude that it was not punishment so severe as to "shock the moral sense of the community." *Id.* So while Eaton cited this case to bolster his own argument, it actually militates against it, because just like in *McKellar*, the error here was not deliberately planned to cause unnecessary emotional pain.

{¶ 50} Finally, the trial court found that Eaton's sentence had become "constitutionally impermissible as disproportionate to [his] remorse and rehabilitation and

outweighs the culpability for which [he has] already been punished." Decision and Entry at 7. However, it is not the duty of the trial court to determine whether Eaton has been "punished enough." The decision as to whether he has been sufficiently rehabilitated is left to the adult parole authority. "It may grant him parole when in its judgment there is reasonable ground to believe that paroling him would further the interests of justice and be consistent with the welfare and security of society." *State ex rel. Moore v. Ohio Adult Parole Auth.*, 8th Dist. Cuyahoga No. 81757, 2003-Ohio-1844, ¶ 9. The APA may find that Eaton's release is proper, that he has been rehabilitated, and that he has served enough time for the crimes he committed in 1985, but that is not a judgment the trial court has authority make.

**{¶ 51}** We do not believe that returning Eaton to serve his validly-imposed sentence after a legally invalid respite is shocking to any reasonable person or the community. Therefore, we conclude that returning Eaton into the custody of ODRC is not cruel and unusual punishment in violation of his Eighth Amendment rights.

**{¶ 52}** The State's assignment of error is sustained.

**III.     Conclusion**

**{¶ 53}** Having rejected all of Eaton's constitutional and non-constitutional arguments, the judgment of the trial court will be reversed, and the case will be remanded for proceedings which will facilitate the return of Eaton into the custody of the ODRC. The trial court will have 45 days from this decision to effectuate the mandate.

. . . . . . . . . . . . .

WELBAUM, J., concurs.

DONOVAN, J., concurs:

**{¶ 54}** I concur in the majority's legal analysis, which is technically sound, although some may, in this case, conclude that mercy and the law cannot be reconciled.

Copies sent to:

Mathias H. Heck, Jr.
Andrew T. French
Jon Paul Rion
Catherine H. Breault
Hon. Richard S. Skelton